Case 4:05-cv-00183-RLV Document 76 Filed 06/22/06 Page 1 of 14

FILED IN CHAMBERS
U.S.D.C. Atlanta

JUN 2 2 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

FLOYD D. MANNING,

      Plaintiff,

v.

STEVE WILSON, Sheriff, Walker County, Georgia, RON CLARK, Deputy Sheriff, Walker County, Georgia, and PAMELA S. PANGLE, Parole Officer, State Board of Pardons and Paroles, Walker County, Georgia, and JOHN DOE, Deputy Sheriff, Walker County, Georgia, in their official and individual capacities,

      Defendants.

CIVIL ACTION

NO. 4:05-CV-183-RLV

O R D E R

This is an action pursuant to 42 U.S.C. § 1983, in which the plaintiff alleges that his constitutional rights were violated when his house was illegally searched by a Walker County Deputy Sheriff and a Parole Officer of the State Board of Pardons and Paroles; the complaint alleges that the unconstitutional search was the result of inadequate training and an official policy of the Sheriff's Department. The complaint also asserts a state law claim for trespass.[1]  Pending before the court are the defendants' motions

---

[1] In Count 1, which is titled "Violations of Constitutional Rights," the plaintiff alleges, "Defendants [*sic*] intentional acts inflicted emotional distress upon plaintiff." The plaintiff never explains how this is a constitutional violation. Broadly construing the complaint, the court treats this allegation as a state claim for intentional infliction of emotional distress. This state law claim is subject to dismissal for the same reason that the plaintiff's trespass claim is subject to dismissal.

for summary judgment [Doc. Nos. 44 and 49].[2]

## I. FACTUAL BACKGROUND

On August 30, 2004, Parole Officer Pamela S. Pangle was informed that Ricky McLemore, who was on parole for the offense of statutory rape and was being supervised as a sex offender, had cut his monitoring strap. As a result, she secured an arrest warrant and went to his residence. McLemore was not at his residence, but Officer Pangle and another officer observed him in a passing vehicle, and they turned around to pursue him. McLemore was driving the vehicle, and a male and female passenger were also in the vehicle.

After turning down a dead-end road, McLemore was forced to park the car. The three passengers exited the vehicle, and McLemore and the male passenger fled into the woods. The female passenger was apprehended and identified one passenger as Kevin Manning and the other as "John." However, when shown a picture of McLemore, she confirmed that "John" was, in fact, McLemore. She stated that she did not know where Manning lived but that he had called her earlier in the day and that she had his phone number on her caller ID, which she provided to Officer Pangle.

---

[2] The motions were filed on behalf of Steve Wilson, Ron Clark, and Pamela S. Pangle. The complaint also named a John Doe, who purportedly acted as a lookout during the search of the plaintiff's house. Since the Federal Rules of Civil Procedure do not contemplate the naming of a John Doe as a defendant, the court hereby sua sponte dismisses the plaintiff's claim against that fictional entity.

On August 31, 2004, Officer Pangle and Parole Officer Andrew Stephens took the phone number to the Fort Oglethorpe, Georgia, police department, where it was identified as belonging to Dennis Manning at 111 Robin Lane, Rossville, Georgia.[3] Officer Pangle contacted the Walker County Sheriff's Office so that local law enforcement would know that they were in the area to apprehend a sex offender. She requested that Deputy Ron Clark assist her in serving the arrest warrant on McLemore. His assistance was requested so that he could transport McLemore to jail in his vehicle, since Officer Pangle's vehicle was not equipped to transport prisoners. Shortly thereafter, Officers Pangle and Stephens went to the Manning residence to question Kevin Manning about the whereabouts of McLemore. Deputy Clark met Officers Pangle and Stephens at 111 Robin Lane.

Upon leaving their vehicle, Officers Pangle and Stephens went to the rear of the house. Officer Pangle tried to call the house to make sure that they were at the correct location; she heard the phone ringing inside the residence, but there was no answer. She knocked on the back door, but no one answered. Deputy Clark knocked on the front door, and, according to his testimony, the door "just popped open." While Officer Stephens stayed at the rear of the house, Officer Pangle went back to the corner of the house, where she could observe both Officer Stephens and Deputy Clark and

---

[3] The plaintiff's name is Floyd Denny Manning, but he uses the nickname "Dennis."

3

asked Deputy Clark if he had made contact with anyone. He replied that he had an open door. Officer Pangle then came around to the front of the house.

According to Deputy Clark, the following then took place:

> Well, I made an announcement and, when I looked in, I seen something like blankets or something had been drug off in the floor. Things just didn't look normal like, you know, it should. And when I made the announcement who I was and that I was Deputy Clark with the Sheriff's Department and I hollered out three or four times and knocked on the seal of the door trying to get someone's attention, then I felt like maybe something could be wrong and so I made the announcement to clear the [air],[4] that I was fixing to go in and check the residence.
>
> . . . .
>
> Well, sir, like I said, we went there basically to speak with Kevin, to see if maybe Ricky was there or if he might know where Ricky was. When we got on the scene, you know what happened as far as the door coming open when I knocked on it. I made a decision then - you know, it's kind of an emergency situation if you feel like something has gone wrong or possibly someone's hurt. My first thought was, you know, Mr. Manning could be hurt or his wife or somebody in the residence. My second thought was, well, we're looking for a fugitive who is associated with his son who I've dealt with and, through my experience dealing with him in the past, he's - can be a pretty bad character sometimes; and, you know, I just had a bad feeling in my gut that something was wrong.

Deposition of Ron Clark at 15, 22.

Deputy Clark and Officer Pangle then walked through the house, looking in each room (except one room that was padlocked). Finding no one in the house, they then left the residence and waited in the

---

[4] An officer "clears the air" when he calls dispatch and requests that no officer call in during that time in case emergency medical services or additional officers are needed. This prevents other officers from stepping over other officers' transmissions.

4

driveway for a few minutes.[5] From the dispatch records, it appears that approximately 15-20 minutes elapsed from the time that Deputy Clark and Officer Pangle went into the house until they came back outside. A few minutes later, the plaintiff arrived and was told what had taken place.

On August 26, 2005, the plaintiff filed the instant action. The matter is now ripe for ruling on the pending motions for summary judgment.

## II. LEGAL DISCUSSION

By order dated December 21, 2005, this court granted in part and denied in part the motion for partial judgment on the pleadings filed by Sheriff Wilson and Deputy Clark. In that order, the court noted that the plaintiff's federal claims against these defendants in their official capacity were barred by the Eleventh Amendment. The court also dismissed the plaintiff's state law claims against these defendants on the ground that they were entitled to official immunity in their individual capacity and to sovereign immunity in their official capacity. Officer Pangle is entitled to have the plaintiff's federal claims against her in her official capacity and

---

[5] Although the complaint alleges that Deputy Clark and Officer Pangle took private notes from his dresser, took phone numbers from his caller ID, and obtained phone records from the phone company, Deputy Clark and Officer Pangle deny that they performed such acts, and the plaintiff has not come forward with any evidence to dispute that testimony. The complaint also alleges that the defendants went into a locked room where he kept private and secret Masonic writings. Again, Deputy Clark and Officer Pangle deny that they went into that room, and the plaintiff has not submitted any evidence to the contrary.

the state law claims against her dismissed for the same reasons that these claims against Sheriff Wilson and Deputy Clark were dismissed; therefore, her motion for summary judgment with respect to these claims is granted without further discussion. The only issue before the court is whether the defendants are entitled to summary judgment on the plaintiff's federal claims against them in their individual capacity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, it is clear and undisputed that the defendants were acting within the course and scope of their discretionary authority when they performed the acts complained of. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

The United States Supreme Court has set forth a two part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether

[the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 2513 (2002); see also Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346 quoting Saucier, 533 U.S. at 201. Thus, the court must first analyze whether the defendants' conduct, taken in the light most favorable to the plaintiff, violated his constitutional rights.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable" and, thus, are unconstitutional. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380 (1980). "The Supreme Court, however, has recognized that circumstances sometimes preclude the obtaining of a warrant and therefore has allowed warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist." United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983).

> The exigent circumstances exception recognizes a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." Michigan [v. Tyler], 436 U.S. [499] at 509, 98 S.Ct. [1942] at 1949.

7

> The exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.
>
> United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002).

The test of whether exigent circumstances exist is an objective one, i.e., whether an objectively reasonable officer in the same situation could have believed that exigent circumstances existed. *See* United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991); *Vinyard*, 311 F.3d 1340.

Although the courts have talked in terms of "probable cause" to search a residence, in the context of qualified immunity from a section 1983 claim, the police officer need not have actual probable cause but needs only to have "arguable probable cause." Jones v. Cannon, 174 F.3d 1271 (11th Cir. 1999). "Because only arguable probable cause is needed, the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Therefore, the court will first determine whether Deputy Clark and Officer Pangle had arguable probable cause to search the plaintiff's residence and then will determine if exigent circumstances also existed that

would allow them to enter without a warrant.[6]

In his brief, Deputy Clark states the basis for probable cause as follows:

> When he knocked on the front door to Plaintiff's residence, the door popped open. Defendant Clark observed that the house appeared disheveled and appeared to have been ransacked. Defendant Clark was aware that Mr. McClemore had been in the company of Kevin Manning, had fled from law enforcement officers just the day before, and that Mr. McClemore was a convicted felon and a "pretty bad fellow." Thus, it was reasonable for Defendant Clark to believe that Mr. McClemore had only recently fled from Plaintiff's house. Moreover, with the front door unsecure and the visible portions of the house appearing ransacked, it was reasonable for Defendant Clark to believe that a burglary might be in progress. In addition, with Plaintiff's front door unsecure and no one answering to Defendant Clark's announcements, it was also reasonable for Defendant Clark to believe that someone inside the residence may be injured or ill and in need of assistance.
>
> Brief of Defendants Wilson and Clark in Support of Their Motion for Summary Judgment at p. 19.

However, the statements in the brief concerning the appearance of the inside of the house overstate Deputy Clark's deposition testimony. In his deposition, Deputy Clark stated, "Well, I made an announcement and, when I looked in, I seen something like blankets or something had been drug off in the floor. Things just didn't look normal like, you know, it should. . . . The whole house just seemed like it was unkempt." Deposition of Deputy Ron Clark at pp. 15, 22.

---

[6] In his initial brief, Deputy Clark argued that he had actual probable cause to search the residence; however, in his reply brief, he asserts that he had arguable probable cause. The court will, of course, apply the arguable probable cause standard.

9

After considering the testimony of Deputy Clark, the court holds that the fact that Kevin Manning may have been with Mr. McClemore earlier does not provide arguable probable cause for believing that Mr. McClemore was at the plaintiff's residence on the day in question. The court further holds that an unlocked door and an unkempt appearance do not provide arguable probable cause for believing that a burglary is in process or that a person has been injured inside the house.

Officer Pangle testified as follows with respect to the appearance of the inside of the plaintiff's house: "I did observe that the house was arrayed as if someone had gone in looking for something. . . . There were things out of place. There were blankets and pillows on the couch that were kind of – just kind of messed up. It did not look – it looked as if someone had been looking for something. Things looked out of place." Deposition of Pamela S. Pangle at pp 14-15.

After considering the testimony of Officer Pangle, the court holds that blankets and pillows on a couch that are "kind of messed up" and things looking "out of place" do not provide arguable probable cause for believing that a burglary is in process or that a person has been injured inside the house.

However, even if the court had determined that arguable probable cause had existed, Deputy Clark and Officer Pangle still would not be entitled to qualified immunity because of the lack of exigent circumstances, as discussed below.

10

The Eleventh Circuit has stated, "One of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation." *Holloway*, 290 F.3d at 1335. In *Holloway*, the Eleventh Circuit gave several examples where federal courts had upheld warrantless searches based on endangerment to life: report of woman and child in danger in crack house, explosion in apartment, open access to controlled substances by children, medical aid to defendant shot by police, screams in the night, report of gunshots, report of dead body. All of these cases present far more serious scenarios than that confronted by Deputy Clark and Officer Pangle.

In ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. Burton v. City Belle Glade, 178 F.3d 1175 (11th Cir. 1999). Viewed in that light, the facts here show a disheveled house with an unsecured front door. Even when coupled with the fact that the son of the house's owner was seen in the presence of a sex offender the previous day, the appearance of the inside of the house is insufficient to create the exigent circumstances needed for a warrantless entry into the house.

For these reasons, the court holds that Deputy Clark and Officer Pangle are not entitled to qualified immunity with respect to the plaintiff's claim for unreasonable search of his house.

In his complaint, the plaintiff alleges that he was "humiliated and embarrassed" by the invasion of his home.

11

Complaint at ¶ 14. To the extent that this allegation may be construed as a defamation or damage to reputation claim, the court notes that reputation alone is neither a property or liberty interest protected by the Fourteenth Amendment. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155 (1976). The defendants are entitled to summary judgment on this claim.

Since the plaintiff does not contend that Sheriff Steve Wilson participated in the actual search of his residence, any liability on his part must be predicated on supervisory liability. The Eleventh Circuit has delineated what must be shown before supervisory liability may be imposed.

> "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Alternatively, the causal connection may be established when a supervisor's "'custom or policy . . . result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."
>
> Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal citations omitted).

In the instant case, the plaintiff has not come forward with

12

any evidence of any "widespread abuse" that would put Sheriff Wilson on notice of a need to better train his deputies. Furthermore, the plaintiff has not shown any custom or policy on behalf of the sheriff that would show deliberate indifference to constitutional rights,[7] nor has he presented any facts showing that Sheriff Wilson has directed that his deputies act unlawfully.

Sheriff Wilson has produced a copy of his Policy and Procedure regarding searches and seizures. It notes that a warrant generally must be obtained except under limited circumstances, such as consent, incident to an arrest, and exigent circumstances. The section on exigent circumstances provides:

> When the safety of an individual or the public reasonably appears to be threatened and harm appears to be imminent or escape of the perpetrator is likely to be immediate, a deputy may immediately search a place or vehicle and use such force as is reasonable and necessary to gain entry to the place including breaking open doors. Use of force must be documented on a Use of Force Report.

This written policy fully comports with the law of the Eleventh Circuit.

---

[7] The plaintiff has alleged that the sheriff has an "open door" policy which permits deputies to enter any house with an open door. However, Sheriff Wilson has produced his written policy regarding searches and seizures, and there is no mention of such a policy. Other than his own statement that such a policy exists, the plaintiff has produced no evidence of that policy. In opposing a motion for summary judgment, a plaintiff has the burden of coming forward with specific facts showing a genuine dispute. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1986).

For the foregoing reasons, the court holds that the plaintiff has failed to show that Sheriff Wilson has violated any of his constitutional rights. Therefore, Sheriff Wilson is entitled to summary judgment on the plaintiff's section 1983 claims.

### III. SUMMARY

The defendants' motions for summary judgment [Doc. Nos 44 and 49] are DENIED with respect to the plaintiff's section 1983 claims against Deputy Clark and Officer Pangle in their individual capacity; in all other respects, the motions are GRANTED.

SO ORDERED, this 22nd day of June, 2006.

ROBERT L. VINING, JR.
Senior United States District Judge

14